## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 29 2019, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffery M. Haupt
Law Office of Jeffery Haupt
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Natalie F. Weiss
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of S.H., Mother, A.M., Father,[1] and M.M. and L.M., Children:<br><br>S.H.,<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services, | January 29, 2019<br><br>Court of Appeals Case No. 18A-JT-1813<br><br>Appeal from the St. Joseph Probate Court<br><br>The Honorable James Fox, Judge<br>The Honorable Graham Polando, Magistrate |

---

[1] We note that, although Father's parental rights were also terminated, he does not join in this appeal. However, under Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.

*Appellee-Petitioner.*

Trial Court Cause Nos.
71J01-1709-JT-81
71J01-1710-JT-104

**Kirsch, Judge.**

[1]     S.H. ("Mother") appeals the juvenile court's order terminating her parental rights to her minor children, M.M., born on September 24, 2002, and L.M., born on April 11, 2009 (together, "Children").[2] Mother raises two issues on appeal, which we restate as:

> I.     Whether the juvenile court abused its discretion when it denied her motion to continue the termination hearing; and

> II.    Whether the juvenile court's judgment terminating her parental rights to Children was clearly erroneous.

[2]     We affirm.

---

[2] Father's parental rights were terminated on January 11, 2018, but because he does not appeal, we only set forth those facts necessary to Mother's appeal

## Facts and Procedural History

[3] Mother has a history with the Indiana Department of Child Services ("DCS"). Mother's first child (who is not a subject of this appeal) was removed from Mother's care in 2006 because the child tested positive for cocaine at birth, and Mother, subsequently, signed a voluntary termination of her parental rights to this child. *Tr. Vol. 2* at 97. In May 2008, Children were placed with their great-grandmother after Mother tested positive for methamphetamine and THC. *Tr. Vol. 3* at 21. Children were adjudicated to be children in need of services ("CHINS") as a result. *Tr. Vol. 5* at 2-10, 26-30. On July 15, 2009, Children were placed in relative foster care when Mother's substance abuse counselor believed Children were in danger because of Mother's recent relapse. *Tr. Vol. 3* at 21. Wardship for both Children was released on May 13, 2010, and the CHINS proceedings were closed. *Tr. Vol. 5* at 24-25, 43-44.

[4] In September 2016, DCS received a report that Mother had been arrested for possession of cocaine and narcotics and that Children were living with their eighty-year-old maternal great-grandmother ("Grandmother"), who had very limited mobility and was receiving dialysis three times a week. *Tr. Vol. 3* at 17. The report also indicated that Children's father ("Father") was homeless and receiving supplemental security income for methamphetamine-induced psychosis. *Id.* DCS met with Mother, who reported that she had overdosed on heroin on June 20, 2016. *Id.* at 33. On October 13, 2016, DCS met with Grandmother and observed her home to be organized, but that Grandmother's mobility was limited. *Id.* at 34. Mother was released from incarceration on

October 17, 2016, but DCS was unable to locate her. *Id.* On November 10, 2016, DCS again went to Grandmother's home and observed the home to be in "complete disarray" and found broken glass in one of the beds, along with food items and a lighter. *Id.* Grandmother told DCS that Mother was visiting Children in the evenings. *Id.* She also told DCS that M.M. frequently missed school and would often stay with friends in a different town. *Id.* A few days later, DCS again met with Grandmother, who disclosed that, during the last meeting, Mother had been hiding in a closet. *Id.*

[5] After doing an assessment, DCS filed a CHINS petition on November 17, 2016, alleging that Mother was unable to meet the needs of Children. *Id.* at 32-36. On November 18, Children were removed from Mother's care and placed with maternal grandfather ("Grandfather"). *Id.* at 39-40. On December 15, 2016, Mother admitted the allegations in the CHINS petition, which the juvenile court accepted, and Children were adjudicated to be CHINS. In its dispositional order, the juvenile court maintained Children's removal and placement outside of Mother's home. *Id.* at 68. The juvenile court ordered Mother to do the following:

> (1) contact the family case manager ("FCM") every week to allow FCM to monitor compliance;
>
> (2) allow FCM or other service providers to make announced or unannounced visits;
>
> (3) keep all appointments with any service provider or DCS or provide advance notice with a good cause;

(4) sign any releases necessary for FCM to monitor compliance with the order;

(5) maintain suitable, safe, and stable housing with adequate bedding, functional utilities, adequate food;

(6) secure and maintain a legal and stable source of income;

(7) not use, consume, manufacture, trade, distribute or sell any illegal controlled substances, and only take prescription medications for which a valid prescription exists and only in the doses specified in the prescription, and not permit illegal controlled substances in the home or in the presence of Children;

(8) reimburse DCS expenses for services to benefit Children in the amount as established by court order;

(9) complete a parenting assessment and successfully complete all recommendations developed as a result of the assessment;

(10) complete a substance abuse assessment and follow all treatments and successfully complete all treatment recommendations developed as a result of the assessment;

(11) complete a psychological evaluation as referred and approved by DCS and successfully complete any recommendations that result from the evaluation;

(12) meet all personal medical and mental health needs in a timely and complete manner;

(13) meet all the medical and mental health needs of Children in a timely and complete manner; and

> (14) attend all scheduled visitations with Children and comply
> with all visitation rules and procedures set forth.

*Id*. at 71.

[6] On October 30, 2017, DCS filed a petition to terminate Mother's parental rights to Children. On March 22, 2018, the juvenile court set an evidentiary hearing on the petition for June 1, 2018. On May 25, 2018, Mother filed a motion to continue the hearing, stating that she had been recently accepted into a residential program at the YWCA for substance abuse treatment. *Appellant's App. Vol. 2* at 89. A hearing was held on the motion, where Mother's counsel requested that the juvenile court give Mother "a chance to work through that program. It may not change any outcome on this particular matter. . . . I do feel that the continuance would allow . . . her to continue to work with me on a defense on this particular matter." *Tr. Vol. 2* at 4. The juvenile court denied the motion to continue, reasoning that Mother was actually asking for more time to remedy the conditions resulting in removal or continued placement outside the home and that such an inquiry was "the proper subject of the [termination] hearing itself." *Id*. at 6.

[7] At the June 1, 2018 evidentiary hearing on the petition to terminate Mother's parental rights, the following evidence was presented. Mother had a significant and lengthy history of substance abuse beginning at the age of twelve when she started using cocaine. *Tr. Vol. 2* at 98. She began using heroin at the age of seventeen and continued to use drugs thereafter. *Id*. at 98-100. By July 2016, Mother was using heroin almost daily. *Id*. at 100. Mother also had a criminal

history that included a charge of operating a vehicle while intoxicated on June 21, 2016, convictions for unlawful possession of a narcotic drug and possession of a syringe in September 2016, and a conviction for visiting a common nuisance in April 2017. *Id.* at 51-52, 101-02. At the time of the hearing, Mother also had a pending charge of conversion for which she had been arrested in March 2018. *Id.* at 102.

[8] FCM David Mickelson ("FCM Mickelson") testified as to Mother's contact with him and stated that there "wasn't a lot [of communication]." *Id.* at 43-44. There were long periods of time where Mother would not communicate at all with him, even when he attempted to contact her every day. *Id.* at 44-45. When FCM Mickelson went to Mother's residence for visits, whether announced or unannounced, Mother would not always answer the door, and she did not keep DCS updated as to where she was staying. *Id.* at 45-46. Mother canceled several appointments with the court appointed special advocate ("CASA") and did not attend a scheduled meeting with FCM Mickelson's supervisor. *Id.* at 46. FCM Mickelson testified that Mother missed thirteen of her scheduled supervised visits with Children, and she gave advanced notice of her absence for only five of those missed visits. *Id.*

[9] FCM Mickelson testified that Mother never obtained suitable and safe housing as required under the dispositional order. *Id.* She never maintained her own housing and, instead, moved frequently, either living in the homes of Grandmother, her boyfriend, or her boyfriend's mother. *Id.* at 46-47. At the time of the termination hearing, Mother was living at the YWCA. *Id.* at 47.

Likewise, during the pendency of this case, Mother never obtained a stable source of income as required. *Id*. at 20. Brandon Duke ("Duke"), who worked at Lifeline Youth Services, attempted to work with Mother on obtaining stable employment and homemaking services. *Id*. at 17, 19-20. Although Mother participated in the intake session, she told Duke that she was not looking for employment because it was too overwhelming, and she wanted to focus on getting Children back and having visitations with them. *Id*. at 20. Duke also attempted to work on budgeting with Mother, but she refused to participate. *Id*. Mother did not engage in any homemaking services after the initial intake session. *Id*.

[10] Evidence was also presented regarding Mother's substance abuse, which showed that Mother continued to use illegal drugs after the dispositional order was entered. In 2017, she was charged with operating a vehicle while intoxicated, possession of narcotics, visiting a common nuisance, and unlawful possession of a syringe. *Id*. at 49, 51, 101. Mother admitted that she had a problem with using methamphetamine and heroin. *Id*. at 56, 101. Throughout the proceedings, Mother submitted to drug screening, and repeatedly tested positive for different substances, including THC, cocaine, methamphetamine, and amphetamines. *Tr. Vol. 5* at 57-103, 154-92. Between January 11 and March 22, 2018, Mother failed to submit to any drug screens and did not respond when contacted to do so. *Tr. Vol. 2* at 50.

[11] Mother completed parenting and psychological assessments, but FCM Mickelson testified that she failed to complete the recommendations resulting

from those assessments. *Id.* at 53-54. Gary Robinson, an addictions specialist at The Bowen Center, conducted a substance abuse assessment in November 2017 and diagnosed Mother with Heroin Use Disorder. *Id.* at 12-13. He recommended that Mother attend one substance abuse group and one individual session weekly for sixty to ninety days. Mother did not attend any individual sessions and only attended three group sessions. *Id.* at 13. Mother entered into an intensive out-patient program at the Center for Positive Change but was unsuccessfully discharged from the program. *Id.* at 54-55. FCM Mickelson testified that Mother had a pattern of starting treatment and then being unsuccessfully discharged. *Id.* at 57. Mother went into the residential program at the YWCA in May 2018, just prior to the termination hearing. *Appellant's App. Vol. 2* at 89. FCM Mickelson was not able to testify with certainty as to whether Mother was meeting her personal medical and mental health needs and was concerned because Mother had been prescribed Suboxone for her heroin addiction, but the drug did not show up on several of her drug screens. *Tr. Vol. 2* at 55.

[12] As for visitations with Children, evidence was presented that visitations were originally scheduled two days per week for two hours, and Duke provided Mother with transportation to those visits and supervised them. *Id.* at 17-18. Duke testified that Children had positive interactions with Mother during most of the supervised visits. *Id.* at 23. Mother attended the visits regularly at first, but she missed a total of thirteen visits out of approximately forty that were scheduled since the CHINS petition was filed. *Id.* at 18, 46. After she missed

three or four in a row, her visitation services with Duke were cancelled in accordance with the policy that prohibited missing multiple visits. *Id*. at 18. Visitation services were later resumed, but suspended after December 6, 2017, when Mother came to a supervised visit under the influence of alcohol. *Id*. at 56.

[13] Shannon Johnson ("Johnson"), Children's therapist, began providing services in December of 2016. *Id*. at 26. Johnson testified that M.M. had a history of engaging in self-harm and had cut herself on several occasions and attempted to overdose on Ibuprofen. *Id*. at 29. Johnson also testified that M.M. recently started drinking alcohol, using marijuana, and having suicidal thoughts and that, at one point, M.M. was walking on railroad tracks because she "wanted to try to get hit by a train." *Id*. at 30. M.M. told Johnson that she had both positive and negative feelings about Mother and that she was aware that Mother came to a visit while intoxicated and had a bottle of alcohol in her purse and that Mother had used drugs in front of her. *Id*. at 31, 33. Children's CASA testified that, although she had not questioned Children about their relationship with Mother, both Children informed her that they wanted to stay with their grandparents. *Id*. at 94.

[14] Both Johnson and the CASA testified that Children were doing well in their current placement and had bonded with their grandparents. *Id*. at 33-34, 92. Other testimony established that L.M. had been participating in gymnastics and making friends at school and that M.M. had a job at McDonald's, and she was proud to be working and making money. *Id*. at 34-35. Both FCM Mickelson

and the CASA testified that termination would be in Children's best interests because Children needed permanency and stability in their lives, which they were getting from living with their grandparents. *Id*. at 64, 92-93. DCS's plan for Children was adoption. *Id*. at 94.

[15] At the conclusion of the hearing, the juvenile court took the matter under advisement. On July 19, 2018, it issued its order terminating Mother's parental rights to Children. Mother now appeals.

## Discussion and Decision

## I.    Motion to Continue

[16] Generally speaking, a trial court's decision to grant or deny a motion to continue is subject to abuse of discretion review. *In re K.W.*, 12 N.E.3d 241, 243-44 (Ind. 2014) (citing *Rowlett v. Vanderburgh Cty. Office of Family & Children,* 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*). "An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion," but "no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial." *Id.*

[17] Mother contends that the juvenile court abused its discretion when it denied her motion to continue the termination hearing to allow her time to complete the residential program at the YWCA that she was enrolled in at the time of the hearing. She asserts that the juvenile court should have granted her motion because the brief continuance requested would not have prejudiced DCS, but

the denial of her motion was prejudicial to her. Mother argues that the approximately twelve months between the commencement of the CHINS case and the filing of the termination petition was not a lengthy amount of time, and a brief continuance would not have caused undue hardship to Children.

[18] In *Rowlett*, 841 N.E.2d 615, our Supreme Court found that good cause was shown to grant a continuance in order to provide a parent with an opportunity to participate in services offered by DCS that were directed at reunification. *Id.* at 619. There, the father requested a continuance because he was incarcerated and would not be released until six weeks after the termination hearing. *Id.* The trial court denied his continuance, but on review, our Supreme Court found that the trial court abused its discretion, reasoning that because the father was imprisoned, he had not had the opportunity to benefit from services offered by DCS. *Id.* at 618-20. The Court found the denial of a continuance particularly harsh because the father had successfully participated in numerous programs offered by the correctional facility while he was incarcerated. *Id.* at 619.

[19] Here, unlike in *Rowlett*, from the time the dispositional order was issued, Mother had the opportunity to participate in, and benefit from, services directed at reunification. However, contrary to her contentions that she "was able to show some compliance with services," *Appellant's Br*. at 12, Mother failed to take advantage of these services. Accordingly, Mother has failed to demonstrate a "good cause" for granting her motion to continue the termination hearing.

[20]    Mother argues that she was prejudiced by the denial of her motion to continue because a continuance would give her the opportunity to complete her residential substance abuse program, and she further asserts that the nineteen-month-period of time since the CHINS petition was filed was an insufficient amount of time to prove her ability to parent Children. However, in the time since the CHINS petition was filed, Mother failed to complete any of the services offered by DCS, failed to consistently attend visits with Children, and continued to use illegal drugs and commit criminal offenses. Although she was in a residential treatment program at the time of the termination hearing, Mother did not begin the program until only a few weeks before the termination hearing occurred. At that time, Mother had already had almost one and a half years to participate and complete services, and she failed to do. We conclude that Mother has not shown good cause for granting her motion to continue, nor has she shown prejudice. The trial court did not abuse its discretion when it denied Mother's motion to continue the termination hearing.

## II.    Sufficient Evidence

[21]    As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and parental rights are of a constitutional dimension, the law allows for the

termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re T.F.*, 743 N.E.2d at 773. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[22] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[23] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[24] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[25] Mother argues that the juvenile court erred in finding that DCS met its burden of proof to support termination of her parental rights. Specifically, Mother contends that DCS failed to prove that there was a reasonable probability that the conditions that resulted in Children's removal or the reasons for placement outside of the home would not be remedied because, although she struggled to fully comply with the requirements under the dispositional order, she asserts that she did complete certain aspects of services and maintained visits with Children. She points to the fact that, at the time of the hearing, she was in a residential program through the YWCA that she had found on her own and was showing promise in combating her addiction issues. Mother further claims that DCS failed to prove that termination was in the best interest of Children because evidence was presented that, during visitations with Children, Mother's behavior was "mostly appropriate," and Children enjoyed the visits and that the juvenile court ignored the positives in the relationship between Mother and Children. *Appellant's Br.* at 22.

### Remediation of Conditions

[26] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not

be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *A.F.,* 762 N.E.2d at 1252.

[27] Here, the conditions that led to Children's removal from Mother's care were Mother's substance abuse issues and related pending criminal charges. *Appellant's App. Vol. 2* at 61, 66. During the assessment by DCS, it was discovered that Children were staying with eighty-year-old Grandmother who had limited mobility and was receiving dialysis three times a week and that Mother was visiting Children in the evenings. *Tr. Vol. 3* at 17, 34. The home was observed to be in "complete disarray" with broken glass, food items and a lighter in one of the beds. *Id.* at 34. It was also discovered that M.M. frequently missed school and would often stay with friends in a different town. *Id.*

[28] As a result of the CHINS adjudication, Mother was ordered to participate in many different services, to maintain stable housing and employment, and to not use illegal drugs. However, the evidence presented at the termination hearing showed that Mother failed to obtain adequate housing or employment and had told a service provider that she was not looking for employment while the case was pending. *Tr. Vol. 2* at 20, 46-47. Mother failed to remain in contact with DCS and other service providers. *Id.* at 43-46. Although Mother completed parenting and psychological assessments, she failed to complete the recommendations resulting from those assessments. *Id.* at 53-54. Following completion of a substance abuse assessment, it was recommended that Mother attend one group and one individual session weekly for sixty to ninety days; she did not attend any individual sessions and only attended three group sessions. *Id.* at 13. Mother later entered an intensive out-patient program but was

unsuccessfully discharged. *Id.* at 54-55. FCM Mickelson testified that Mother had a pattern of starting treatment and then being unsuccessfully discharged. *Id.* at 57. Mother went into the residential program at the YWCA in May 2018, just prior to the termination hearing. *Appellant's App. Vol. 2* at 89.

[29] Additionally, although evidence was presented that Children had positive interactions with Mother during most of the supervised visits, Mother missed a total of thirteen visits, and after she missed three or four in a row, her visitation services were cancelled. *Id.* at 18, 23, 46. Visitation services were later resumed but suspended again when Mother came to a supervised visit under the influence of alcohol. *Id.* at 56.

[30] Further, Mother continued to use drugs throughout the duration of this case. Mother had a significant and lengthy history of substance abuse, beginning at the age of twelve when she started using cocaine and continuing as she began to use heroin at the age of seventeen, which she was using daily by July 2016. *Id.* at 98-100. Mother had a criminal history that included a charge of operating a vehicle while intoxicated in June 2016, which was before the CHINS petition was filed, convictions for unlawful possession of a narcotic drug and possession of a syringe in September 2016, and a conviction for visiting a common nuisance in April 2017. *Id.* at 51-52, 101-02. At the time of the hearing, Mother had a pending charge of conversion for which she had been arrested in March 2018. *Id.* at 102. Throughout the proceedings, Mother submitted to drug screening, and repeatedly tested positive for different substances, including THC, cocaine, methamphetamine, and amphetamines. *Tr. Vol. 5* at 57-103,

154-92. Between January 11 and March 22, 2018, Mother failed to submit to any drug screens and did not respond when contacted to do so. *Tr. Vol. 2* at 50.

[31] DCS is not required to rule out all possibilities of change; it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d at 242. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Also, as we have recognized, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.*

[32] At the time of the termination hearing, DCS had been working with Mother for over one and a half years, and Mother had hardly complied with any of the services provided by DCS. She had not remedied her substance abuse issues and had only minimally participated in other services. Although at the time of the termination hearing, Mother was doing well in the residential program at the YWCA, she was removed from the stress of everyday life and did not have access to any illegal drugs. The evidence showed that Mother had a pattern of relapsing after receiving treatment, and it was reasonable for the juvenile court to give less weight to her recent four-week period of sobriety. *See Bergman v.*

*Knox Cty. OFC*, 750 N.E.2d 809, 812 (Ind. Ct. App. 2001) (finding that trial court was entitled to give more weight to parent's historic negative patterns of conduct rather than recent changes just prior to the termination hearing). Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Children's placement outside the home would not be remedied.[3]

### *Best Interests*

[33] In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interest of the child. *In re A.P.* 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, in

---

[3] Although Mother does not challenge the juvenile court's conclusion that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Children's well-being, we do not have to address the issue because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[34] Mother argues that the evidence presented was not sufficient to prove that termination of her parental rights was in the best interests of Children. She specifically points to testimony by Johnson, Children's therapist, who stated that she did not have an opinion about whether the continuation of supervised visitation would be detrimental to Children. *Appellant's Br*. at 21 (citing *Tr. Vol. 2* at 37). Mother also contends that the testimony of the CASA did not support that termination was in the best interests of Children because the CASA stated that she could not answer whether the continuation of the parent-child relationship posed a threat to the well-being of Children. *Id*. (citing *Tr. Vol. 2* at 93). Mother contends that evidence was presented that she had mostly appropriate behavior during visits with Children and that the juvenile court chose to ignore the positives in her relationship with Children.

[35] A juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re A.K.*, 924 N.E.2d at 224. Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id*. (citing *McBride v. Monroe Cty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)). At the time of the termination hearing, Children had been removed from Mother's care for

over one and a half years, and Mother had failed to make the changes in her life necessary to provide Children with a safe and healthy environment. As discussed above, DCS presented sufficient evidence that there was a reasonable probability that Mother would not remedy the reasons for Children's removal from her care. Additionally, the CASA and FCM both testified that they believed termination of Mother's parental rights would be in Children's best interests. *Tr. Vol. 2* at 64, 92-93. Based upon the totality of the evidence, we conclude that the evidence supported the juvenile court's determination that termination of Mother's parental rights was in Children's best interests. Mother's arguments to the contrary are a request for this court to reweigh the evidence, which we cannot do. *In re H.L.*, 915 N.E.2d at 149.

[36] Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[37] Affirmed.

Riley, J., and Robb, J., concur.